We will now call the case of Enriching, Inc. v. Fountain Valley, and I understand that one of the counsel has not arrived, even after being reminded by telephone and searched for around the building. So we will hear from counsel who is here, who I believe is Mr. Barber. Is that correct? Good morning, Your Honors. I believe the issue here is whether or not the city was willing to consider a reasonable accommodation in order to allow Enriching to qualify for a such an accommodation. As I understand it, you offered an alternative drop-off site or suggested an alternative drop-off site. That's correct, Your Honor. If I may refer to an overview, this is the shopping center where Enriching was supposed to have its facility. This is a particular space that they were interested in leasing. And this is Brookhurst Street. When we talk about east of Brookhurst Street, we're talking about the park over here. This is Hyatt up here, north. This is the rear parking lot area of the premises. And is that rear or alley where they initially proposed that the drop-off be? Yes, Your Honor. That's correct. At the October 31st meeting between the city manager and Mr. Doan, the president of Enriching, the city manager recommended or invited Enriching to change its proposal to either a drop-off point on Hyatt, somewhere up in here, or at the north end within this plaza, but at the north end up in this parking lot area up here. And the rationale for that was so that the clientele would not have to cross Brookhurst Street. The evidence was the traffic volume on Brookhurst Street was approximately 50,000 plus passings by vehicles a day. Before you move away from that spot, I know it's kind of hard for you to hold out, which is why I'm asking the question now, perhaps out of the order you might have anticipated. The initial proposal was for a drop-off, and I read it referred to as, I guess, the alley, but that space between the center and those residential, I think you're exactly right. And the objection by the staff was that that had to be kept clear for emergency vehicles and unloading for trucks and so on. That was one of the objections, Your Honor. Was there another one? Yes, there was. Probably the predominant objection was the noise that the buses would create for these private residences back here. How many people were going to be involved in the center? Three vans in the morning, three vans in the afternoon. So not in buses, but vans? Yes, Your Honor. And could they have fit into those parking places? I think they were oversized. They probably would not have fit in a single spot. These were oversized vans. I don't mean to say that they were SUV-type vans. They were not the 40-foot transit buses, but they were larger than your standard family van. Do you know how many people were going to be in each van? Approximately 12, Your Honor. And who uses those parking places? Primarily people that have business in the facility. Primarily owners and operators of the facility. Most of the customers park out in the common area. Are those reserved parking places for the owners? No, I think the key here is, the case law is that when there is more than one accommodation that would be effective in meeting the requirements of the permit, that the city has the prerogative of choosing which accommodation it wants to go with. In other words, an applicant cannot force his wish list on a city. In this particular instance, the city preferred that they propose, that the commission propose at the north end of the parking lot here, where you wouldn't have a noise problem with the residences or on Hile itself. What would have been the nature of the clientele? I understand disabled, but what sorts of disabilities are we talking about? 50% of them were in wheelchairs, wheelchair-bound. Another portion of them, Mr. Dillon says, some of the others used walkers, other walking devices. So it's physical disability we're talking about rather than primarily mental? Yes. And do you think that it was a better alternative to let them off way up at the end there, where they could have come in the alley and just gone in through the back door? Yes, there's no doubt that their wheelchairs are operable, completely capable of... Is there an entrance at the Hile Avenue end of that large structure? There's an entrance here. No, I don't mean a car entrance, I mean a people entrance. Do you understand what I'm asking? I don't think I do, Your Honor. Well, how do people... There's a structure that's a large rectangle there, that's a big structure to the left. Is that the structure where they were going to be? Yes, they were going to be down in here. All right, so how would people get into that structure from their proposal and your proposal? There is a walkway that is adjacent to the front doors of each of these facilities. They would get off the bus, go down the sidewalk, and then cross over here, come on down the sidewalk. Or if they were in the northern part of the parking lot, just come on down the side. Is there a back door? So if the drop-off had been in that, I'll call it the alley, that they could have come in a back door? Yes, Your Honor. So the problem with the alley was strictly the issue of disturbing the neighbors? Primarily disturbing the neighbors. But even assuming that we have no logical reason or basis for denying it there, the law, the ADA, allows us to select another reasonable accommodation. We don't have to go with what they're initially proposing. And I would like to correct or clarify something that was said in the reply brief. I think it's important. My opposing counsel said that we distorted the facts and indicated or suggested that the domes were forced into a situation where they had to capitulate to the city's insistence that the drop-off could not be on the west side of Brookhurst Street. That's an incorrect statement. And that statement was made by my opposing counsel at page one and two. The city did not insist that the drop-off be on the west side of Brookhurst Street. That's an overgeneralization. And I might have been anemic in my brief in making that clear. But I would like to point out at this point that what the city denied was only that they couldn't drop off in the rear of their building. We didn't insist that they couldn't drop off anywhere on the west side of Brookhurst Street. And I can give your honors the citations in the reporter's transcript if you'd like. The ultimate permit that was presented had them dropping off on the east side of Brookhurst, correct? That's correct, your honor. And that was the one that was turned down. But there were other alternatives offered on the west side. Yes. Not necessarily on Brookhurst Street, but on the west side of Brookhurst Street as distinguished from the east side. Yes. The alternative being on Hile. Actually, when you say offered, what we did, your honor, was we invited them to amend their proposal. All right. It was suggested that they do that and that it may result in a different outcome. Yes. And it sounds like what happened in looking at the record as a whole was the point came where they didn't believe the city was serious. They didn't believe it. And the cases say that a city is entitled to follow its lawful procedures in making these kinds of decisions so long as there's not a foredoomed conclusion that the city would deny it. And the evidence in this case was not that it was going to be denied again. And the evidence on that is that the city manager, who is the boss of the city staff, the city planning staff, planning department, which is different than the planning commission, recommends to Mr. Doan that we have a good shot at getting your permit granted if you'll change the drop-off point, as we suggest at this meeting. This is three weeks before the city council meeting on November 20. In addition to that, Mr. Doan sent a letter after that October 31 meeting, and he says, I'm not interested, basically, in going with your suggestion. And at trial, his rationale for backing out or derailing the interactive dialogue process was that Mr. Perea, the planning department head, failed to show up at his premises three days after the October 31 meeting. Well, that meeting was late on a Wednesday afternoon. Mr. Perea testified that he had meetings on Thursday, and his day off was Friday. And on Saturday and Sunday, City Hall is closed. On Monday, the city gets a letter that had been written on Saturday by Mr. Doan saying, we're not interested in the Heil drop-off. Let me make sure. Had there been an actual scheduled meeting on Wednesday afternoon that he missed? There was a meeting on October 31, Wednesday afternoon, that he attended. Mr. Doan attended, and the city manager was there, and Mr. Perea, the city planning department director, was there. But Mr. Perea had said, in the next day or two, I want to come out and look at the premises. Yes. Was there ever an actually sort of scheduled date and time for that meeting? No, Your Honor. Were the Doans actually in the premises waiting for several days for him? Were they in the premises for other purposes? I'm having trouble understanding the dynamic that went on. Frankly, Your Honor, there was no testimony that I recall at trial as to whether or not they were there sitting there waiting specifically for Mr. Perea to show up. I'm assuming that the excerpts of record, as you know, are very skimpy. I'm assuming that this map or this aerial photograph that you're showing us was introduced at trial. Yes. Exhibit 76, Your Honor. The issue is, from what I can glean from the excerpts, is whether the Doans' decision to withdraw from the interactive process was reasonable. Was that – is it your sense that that issue was teed up properly for the jury, such that we're dealing with a properly presented factual determination? From the standpoint of withdrawing from interactive dialogue, that's evidence – that can be evidence of lack of good faith. And the jury was instructed on that. Apparently, the jury considered that as one of the factors involved. That the Doans' decision to terminate the process could be seen as evidence of bad faith. Yes. So I'm just trying to get a sense, because we don't have a complete record. Was that issue squarely presented? The question of why the interactive process failed and whose fault it was, if you will. Was that issue fairly presented to the jury? Yes, Your Honor. At one point in the trial testimony, Mr. Doan admits that he rejects the city's accommodation. That's how I asked the question at trial. Isn't it a fact that you rejected this accommodation? He said yes. And Mrs. Doan also said that when I cross-examined her. Because they didn't believe that the city was in good faith. They didn't believe that the city was interested in resubmitting this change to the Planning Commission or having the city council consider it and approve it. They were fortune-telling, if you will, or forecasting what the city was going to do before the city had a chance to follow this. Right. What I'm getting a sense of, trying to look at the case from their perspective, is that this was taking a really long time and there were alternative after alternative explored and rejected. And then Mr. Perea doesn't come when they think he's going to come. So whether in fact the city was in bad faith, their belief that the city was not negotiating in good faith, was the reasonableness of that belief something that was presented to the trier of facts? So the trier of facts saying, you know what, Doans, you acted reasonably under the circumstances or no, you didn't? Yes, Your Honor. Okay. It was. You know, according to Teal versus Select Artificial Zinc, the city must be given an opportunity to make accommodations for its own lawful procedures. Whether or not an applicant for a permit considers them to be cumbersome, or take longer than expected. Now, this is not a case, Your Honors, where the Planning Commission denied the permit and then the Doans appealed and then the Planning Commission or the City Council denied it. This is a case where we have an interactive dialogue continuing after the Planning Commission made its decision, specifically in the context of a meeting with the CEO of the city, that is the city manager, where he's very specific and he says, I'm not the approving authority, but I will recommend, and I think your chances are good, that if you change your proposal to the Heil drop-off or the north end within the plaza, that we have a good chance of having your permit approved. And so that's what makes this case, that's why I'm here. I mean, if that meeting had not occurred, we would have paid money and we would not have gone to trial. But I think that's what the key is in my client's case, Your Honor. Thank you. I think we understand. Thank you very much. We will submit the case, and I particularly appreciate your willingness to wait the extra time. Thank you for listening. Thank you so much. This case is submitted and we will stand adjourned for this morning's session.
judges: Graber, W. Fletcher, Fogel